*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re DREWIOR/SHIPLEY, Minors.

UNPUBLISHED
December 29, 2022

No. 361623
Wayne Circuit Court
Family Division
LC No. 19-001809-NA

In re DREWIOR, Minors.

No. 361626
Wayne Circuit Court
Family Division
LC No. 19-001809-NA

Before: M. J. KELLY, P.J., and MURRAY and RIORDAN, JJ.

PER CURIAM.

In Docket No. 361623, appellant-mother appeals as of right the trial court's order terminating her parental rights to her minor children ARS,[1] QJD and JED, under MCL 712A.19b(3)(c)(*i*) (failure to rectify conditions that led to adjudication); MCL 712A.19b(3)(c)(*ii*) (failure to rectify other conditions); MCL 712A.19b(3)(g) (failure to provide proper care and custody); MCL 712A.19b(3)(j) (reasonable likelihood that the child would be harmed if returned to the parent)[2]; and MCL 712A.19b(5) (best interest factors). Mother challenges both the trial

---

[1] Appellant-father is the biological father of QJD and JED but is neither the legal nor putative father of ARS. The parental rights of ARS's biological father, who was also mother's estranged husband, are not at issue in this appeal. His case remains pending in the lower court. Notably, on March 16, 2022, ARS's father's whereabouts became unknown, and an arrest warrant was issued for failing to report in violation of his probation.

[2] The trial court did not specify on the record or in its written opinion under which provision it was terminating mother's parental rights. The Department of Health and Human Services (DHHS) sought termination under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g), and (j), and mother challenges the same statutory grounds on appeal.

court's findings regarding the statutory grounds for termination, as well as the determination that termination was in the children's best interests. In Docket No. 361626, appellant-father appeals as of right only the trial court's determination that termination was in the children's, QJD and JED, best interests under MCL 712A.19b(5). We affirm.

## I. BACKGROUND

The primary barriers to reunification throughout the case were mother and father's drug addictions and domestic violence issues. Mother and father consistently missed their weekly drug screenings and, more often than not, tested positive for various illicit substances, including amphetamine, methamphetamine, fentanyl, THC, and cocaine. Moreover, mother and father only partially complied with the court-ordered treatment plan and made practically no progress toward reunification with their children.

The children first came into care in October of 2019 after mother's youngest son, JED, was born positive for several dangerous substances,[3] including opiates, amphetamine, methamphetamine, and THC. JED was hospitalized for 13 days following his birth, requiring morphine to treat his severe withdrawal symptoms. Mother underwent a toxicity screen at the hospital, indicating positive results for THC and amphetamine. Father also submitted to a drug screen, rendering positive results for amphetamine, methamphetamine, and fentanyl. Mother admitted to using substances during her pregnancy with JED, such as unprescribed narcotics, heroin, and prescribed Subutex to treat her addiction to Vicodin. When DHHS filed its petition in 2019, mother was unemployed, father worked "side jobs," and the family lived in the maternal grandmother's home. The children were subsequently placed in the paternal grandmother's care[4].

At the disposition hearing on January 3, 2020, Officer Gruber from the Brownstown police department testified regarding mother and father's history of domestic violence. Specifically, Officer Gruber testified that on February 21, 2018, he responded to a domestic violence complaint at the maternal grandmother's home, where mother and father resided. According to Gruber's testimony, when he arrived at the home, mother reported that father choked her and subsequently grabbed QJD, threatening to hold him hostage, but eventually released QJD and left the home before the police arrived. Gruber testified that he noticed redness around mother's neck. However, mother, father, and the maternal grandmother each testified at this hearing, denying any domestic violence between the couple.

The trial court entered two orders on January 30, 2020, finding grounds for jurisdiction as to mother and father based on their substance abuse and domestic violence issues. The trial court ordered an extensive treatment plan for mother and father, including participation and benefitting from substance abuse assessments and therapy, random weekly drug screenings, individual and

---

[3] Mother has a history with CPS, including in 2013 when QJD was born positive for narcotics and suboxone. AS and QJD were not removed from mother's care because she was prescribed the medications, but DHHS offered services to mother, which she declined.

[4] The children were removed from the maternal grandmother's care because she had narcolepsy, creating an unsafe environment for the children.

family counseling, domestic violence counseling, psychological evaluations, and parenting classes. The court further ordered mother and father to maintain suitable housing, a legal income, and have regular and cooperative contact with the caseworkers.

The record shows that for over two and a half years, mother and father only partially complied, at best, with the court-ordered treatment plan. In the intervening time, mother and father completed parenting classes, although the caseworkers consistently testified that mother and father did not benefit from the course and that they lacked an understanding of how the circumstances affected the children. Mother and father also completed their psychological evaluations. While mother completed her domestic violence therapy, the therapist reported that potential concerns of abuse remained because mother still resided with her abuser, father, who did not complete his portion of domestic violence or individual therapy. Additionally, mother was never employed, and father had difficulty maintaining steady employment as his work entailed primarily "side jobs." Mother and father did not own a car and relied on the maternal grandmother or friends to transport them. While mother and father had secured suitable housing in the maternal grandmother's home, the record shows that they relied entirely on the maternal grandmother to pay for the mortgage and related expenses.

Mother and father did not take an active role in the children's lives. Mother and father were often significantly late, a half hour or an hour late, or would not show up for scheduled parenting time visitations. Out of 220 visits, mother failed to attend 19 visits and was significantly late to 73 visits. Similarly, father failed to attend 71 visits and was significantly late for 62 visits. The caseworker testified that mother and father demonstrated inappropriate and aggressive behaviors, such as arguing in front of the children during parenting time visits. The paternal grandmother frequently reported that at least a few times a month, mother and father appeared to be under the influence and would fall asleep during parenting time visits, often requiring the paternal grandmother to drive them home. For over two and a half years, mother attended only two medical appointments for her children, and father attended none.

Mother and father showed little to no progress toward combating their substance abuse issues. From January of 2020 to February of 2020, mother tested positive for a combination of illicit substances, including amphetamine, methamphetamine, fentanyl, THC, and cocaine. In that same time, father also tested positive for amphetamine, methamphetamine, fentanyl, THC, cocaine, morphine, and heroin. From February 2020 until the first of three bench trials on December 13, 2021, mother and father failed to attend practically every required drug screening.[5]

At the second bench trial, on March 1, 2022, the trial court informed mother and father that sufficient grounds for termination existed but generously offered the parents a final opportunity, urging them to come into compliance with the treatment plan before the best interest hearing scheduled for April 26, 2022. The court found that mother had been addicted to dangerous substances for many years preceding this case and showed no progress in combating her drug use after the children were removed from her care. The court also noted that mother and father did not

---

[5] During the pendency of this case, drug screenings were temporarily suspended until June 1, 2020, following the state-wide shutdowns due to COVID-19. The court noted that mother and father would not be penalized for not screening during that time.

play an active role in the children's lives and had established more of an "aunt and uncle" relationship with their children, considering their attendance record and reported behaviors during parenting time. The caseworker similarly testified at this hearing that the paternal grandmother reported a lack of engagement between mother and father and the children, and occurrences where father would wait in the car outside the home while mother participated in parenting time.

The following month, on April 26, 2022, the trial court terminated mother and father's parental rights to their children, finding that the parents did not rectify the conditions that brought the children into care and that termination was in the children's best interests. The court found that mother and father had made no progress since the last hearing in terms of their substance abuse.[6] In the time between the second bench trial on March 1, 2022, and the final bench trial on April 26, 2022, mother submitted to one drug screening on April 8, 2022, which rendered positive results for amphetamines, methamphetamines, THC, cocaine, fentanyl, and tramadol. In that same time, father missed every required drug screen. The caseworker testified at this hearing that she presented at mother and father's home on April 1, 2022, for an unannounced drug screening but could not complete the screening because mother and father refused to come out from their bedroom.[7] The court further found that both mother and father remained unemployed and failed to make any additional efforts to spend time with, or parent, their children.

## II. ANALYSIS

Mother argues that the trial court erred by finding clear and convincing evidence supporting statutory grounds for termination and that termination was not in the best interests of her children, ARS, QJD, and JED. Father argues that the termination of his parental rights was not in the best interests of his children, QJD and JED.

"This Court reviews for clear error the trial court's factual findings and ultimate determinations on the statutory grounds for termination." *In re White*, 303 Mich App 701, 709; 846 NW2d 61 (2014) (citations omitted). This Court also reviews for clear error the trial court's decision regarding the child's best interest. *In re LaFrance Minors*, 306 Mich App 713, 723; 858 NW2d 143 (2014). "A finding is clearly erroneous if the reviewing court is left with a definite and firm conviction that a mistake has been made." *Id*.

### A. RESPONDENT-MOTHER (DOCKET NO. 361623)

The trial court did not state on the record, nor did it specify in its written order, the statutory basis for terminating mother's parental rights. However, DHHS stated on the record and in its petition that it sought termination of mother's parental rights pursuant to MCL 712A.19b(3)(c)(*i*),

---

[6] In fact, the court stated on the record that father appeared to be under the influence during the trial.

[7] Mother testified at the termination hearing that she was not home when the caseworker presented for the unannounced drug screening. Father also testified that he was not home when the unannounced screening occurred but admitted that mother was home.

(c)(*ii*), (g), and (j). Mother likewise argues that the trial court erred by finding that termination of her parental rights was warranted under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g), and (j).[8]

> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:
>
> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.
>
> (*ii*) Other conditions exist that cause the child to come within the court's jurisdiction, the parent has received recommendations to rectify those conditions, the conditions have not been rectified by the parent after the parent has received notice and a hearing and has been given a reasonable opportunity to rectify the conditions, and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.
>
> * * *
>
> (g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.
>
> * * *
>
> (j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

Before terminating a respondent's parental rights, the trial court must find by clear and convincing evidence that at least one statutory ground for termination exists. *In re HRC*, 286 Mich App 444, 459; 781 NW2d 105 (2009). To terminate parental rights, only one statutory ground for termination needs to be satisfactorily proven. MCL 712A.19b(3).

---

[8] Mother failed to provide an analysis of how each statutory provision was erroneously applied in her severely underdeveloped analysis section. Mother lumped together her analysis of each statutory challenge into a single argument section without any direction regarding which fact or analytical point concerns which portion of the statute. Therefore, mother has abandoned her challenges to MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g), and (j) by failing to properly brief them. See *Seifeddine v Jaber*, 327 Mich App 514, 520; 934 NW2d 64 (2019) (stating that failure to brief an issue constitutes abandonment). Nevertheless, we will provide our independent analysis of the statutory grounds.

Upon review of the record, we hold that the trial court did not err in terminating mother's parental rights under MCL 712A.19b(3)(c)(*i*). The record evidence shows that more than 182 days elapsed between the issuance of the initial dispositional order and the termination of mother's parental rights. The record also clearly demonstrates that the conditions which brought the children within the court's jurisdiction, such as mother's substance abuse, were not rectified. Because mother chose to avoid participating in the majority of her weekly drug screenings, a record of her alleged progress is limited in this regard. What the record does include is that the children were initially removed from mother's care in 2019 after JED was born positive for opiates, amphetamine, methamphetamine, and THC, and experienced severe withdrawals necessitating his 13-day hospitalization following his birth. Mother underwent a toxicity screen at the hospital, which indicated positive results for THC and amphetamine, and she even admitted to using lethal narcotics such as heroin while JED was in utero. The record evidence from January of 2020 to February of 2020 indicates that mother submitted to seven drug screens, all of which rendered positive results for various substances, including amphetamine, methamphetamine, fentanyl, THC, and cocaine. From mother's drug screening in February of 2020, until the trial court terminated mother's parental rights on April 26, 2022, mother failed to attend every required drug screening except for one, on April 8, 2022, where she tested positive for amphetamines, methamphetamines, THC, cocaine, fentanyl, and tramadol. Although she eventually participated in substance abuse therapy, her therapist reported only partial compliance with therapy because she actively avoided the majority of her court-ordered drug screenings. Mother had not acknowledged the severity of her addiction and the impact that the disease has had on her and her children's lives. Mother repeatedly denied or justified her addiction to her caseworkers and the trial court, testifying that she did not need assistance with substance abuse therapy.

To the extent that mother argues that she came into substantial compliance with her parent agency agreement after the supplemental permanent custody petition was filed, she is mistaken. In fact, at no point in almost three years did mother come into "substantial" compliance with the agreement, despite the trial court providing several opportunities to comply. While we acknowledge that mother completed the parenting classes, psychological evaluation, domestic violence and substance abuse therapy, the record otherwise establishes mother's lack of benefit or appreciation of these services. Following the parenting education courses, mother still did not participate in quality parenting time and was often up to one hour late for parenting time. On several occasions, mother and father would argue with each other in front of the children during these visits. The paternal grandmother reported to the caseworker that mother did not engage with her children. The paternal grandmother also reported that at least a few times a month, mother appeared to be under the influence and would fall asleep during visits. Although mother completed her domestic violence therapy, her therapist reported remaining concerns because mother continued to reside with her abuser, father, who did not complete his portion of therapy. Thus, the trial court did not err in finding that there was no reasonable likelihood that mother's barriers to reunification would be rectified within a reasonable time, and, therefore, termination was proper under § 19b(3)(c)(*i*). That being said, the record does not substantiate termination pursuant to § 19b(3)(c)(*ii*), as the record fails to include any additional conditions that caused the children to come within the court's jurisdiction.

The evidence supporting the termination of mother's parental rights under §§ 19b(3)(c)(*i*) also supports termination under § 19b(3)(g) and (j). Termination is appropriate under § 19b(3)(g) because despite the trial court providing mother with meaningful opportunities to participate in

services, she still failed to comply with almost every aspect of the parent agency agreement. See *In re JK*, 468 Mich 202, 214; 661 NW2d 216 (2003) (stating that "a parent's failure to comply with the parent-agency agreement is evidence of a parent's failure to provide proper care and custody for the child"). As noted above, although mother completed parenting classes and domestic violence therapy, there was copious evidence that she could not retain the benefit of these services or incorporate these lessons in her life. Additionally, when the children were removed from mother's care in October of 2019, mother was 29 years old and unemployed. For over two and a half years, mother reported to her caseworkers and the trial court that she was looking for employment, yet the record contains zero evidence of any applications submitted, interviews attended, or job's secured.

The record evidence also supports termination under § 19b(3)(j). Arguably, most evident of the fact that there was a reasonable likelihood that the children would be harmed if returned to mother's care was that mother had not remained drug free. Mother did not demonstrate any progress on the record toward combating her substance abuse issues, as she avoided the majority of the drug screenings required of her and tested positive for fatal substances, including amphetamine, methamphetamine, fentanyl, THC, and cocaine at the drug screenings she did attend. The record evidence indicates that mother could not escape her addiction, and even commingled her lifestyle with her children by using these substances while JED was in utero and presenting to parenting time while under the influence. Mother's addiction inevitably creates an environment unsuitable for and dangerous to children. To make matters worse, mother was not alone in her addiction. The record includes indisputable evidence that father's addiction was just as severe as mothers. That fact, coupled with the evidence of domestic violence in the home between mother and father, surmounts the clear and convincing evidence required to establish grounds for termination.

## B. BEST INTERESTS

Mother and father both challenge the trial court's determination that the termination of their parental rights served the children's best interests.

Even if the trial court finds that the department has established a ground for termination by clear and convincing evidence, it cannot terminate the parent's parental rights unless it also finds by a preponderance of the evidence that termination is in the best interests of the children. *In re Gonzales/Martinez*, 310 Mich App 426, 434; 871 NW2d 868 (2015). See also MCL 712A.19b(5). The court may consider several factors when deciding if termination of parental rights is in a child's best interests, including the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home. *In re Olive/Metts*, 297 Mich App 35, 41-42; 823 NW2d 144 (2012). The court may also consider psychological evaluations, the child's age, parenting techniques during parenting time, and a parent's history. *In re Jones*, 286 Mich App 126, 131; 777 NW2d 728 (2009). "The trial court should weigh all the evidence available to determine the children's best interests." *In re White*, 303 Mich App at 713 (citation omitted). In considering the child's best interests, the trial court's focus must be on the child, not the parent. *In re Moss*, 301 Mich App 76, 88; 836 NW2d 182 (2013). Whether termination of parental rights is in a child's best interests must be proven by a preponderance of the evidence. *Id*. at 90. A trial court need not make redundant factual findings of each individual child when the best interests of the children do not significantly

differ. See *In re White*, 303 Mich App at 715 (finding that "if the best interests of the individual children *significantly* differ, the trial court should address those differences when making its determination of the children's best interests").

The record evidence supported a finding by a preponderance of the evidence that the termination of mother and father's parental rights was in the children's best interests. The trial court did not dispute the apparent bond between mother and father and the children but ultimately found that mother and father's attendance at parenting time twice a week, and nothing more, established more of a close familial relationship than a parental one. See *In re White*, 303 Mich App at 714 (stating that the strength of the bond between the parents and children is only one of many factors for the court to consider). Perhaps the most significant factor weighing in favor of termination was mother and father's proven inability to address their substance abuse issues. Despite the extraordinary length of this case, mother and father made practically no progress in overcoming this barrier. Given their unshakable addictions to fatal substances such as amphetamine, methamphetamine, fentanyl, and cocaine, mother and father could not demonstrate the ability to safely parent their children.

The trial court addressed mother and father's lack of parenting ability and how their compulsive substance use impacted their ability to put their children's needs before their own. Mother and father shortened the time spent with their children by their own doings when they would arrive significantly late to scheduled parenting time visits. When mother and father presented at visitations, they were noted to lack engagement with the children. On more than a handful of occasions, mother and father presented at parenting time under the influence and would fall asleep during the visits. The trial court acknowledged that the children's relative placement with the paternal grandmother would weigh against termination but afforded much greater weight to mother and father's lack of progress and the children's need for permanency and stability.[9] The caseworker's testimony that the children were doing well in their placement and had established a bond with the paternal grandmother also supported the trial court's findings that termination was in the children's best interests.

---

[9] Father relies on *In re Affleck/Kutzleb/Simpson*, 505 Mich 858; 935 NW2d 316 (2019), to argue that the trial court erred by not considering guardianship for QJD and JED because QJD and JED were in the same placement with their half-brother, ARS, whose plan was guardianship. In *Affleck*, our Supreme Court determined that the department's generalized policy against recommending guardianship for children under ten years old was inappropriate. *Id*. Father's argument is misplaced. There is absolutely no indication or suggestion in the record that the department or the trial court relied on a "generalized policy" that disfavored guardianship for children under a certain age when deciding the permanency goal. Notably, guardianship for ARS was not discussed nor implemented until the dispositional review hearing on March 16, 2022, roughly one month before the termination hearing on April 26, 2022. Upon review of the entire record and the trial court's findings, it is evident that the court did not find guardianship proper, considering the extraordinary length that the children were in care, father's substance abuse history, and his lack of progress in the treatment plan.

Another major factor supporting termination as being in the children's best interest was mother and father's failure to derive any benefit from more than two and a half years of services provided. See *In re Olive/Metts*, 297 Mich App at 43 (finding that respondents' failure to derive any lasting benefits from the services provided to her weighed in favor of termination). See also *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012) (emphasizing that while there is a "responsibility to expend reasonable efforts to provide services to secure reunification, there exists a commensurate responsibility on the part of respondents to participate in the services that are offered[,]" and ultimately held that insufficient compliance and benefit from the services provided necessitated the termination of parental rights). Mother and father did not demonstrate appropriate parenting techniques after completing parenting classes, as they were often significantly late to parenting time or would be hostile toward each other in front of the children. Even when addressing mother and father's efforts in the parent agency agreement separately, the evidence indicates that they did not obtain any lasting benefits. Mother completed domestic violence therapy, although the therapist deemed mother's participation unsatisfactory given that mother remained tied to her abuser, father, who failed to complete his portion of therapy. Similarly, mother's participation in substance abuse therapy was derailed by her failure to drug screen and evidence of continued drug abuse. Father did not participate in any of the services except for his psychological examination, although he did not follow its recommendation to complete a substance abuse treatment program. We are not left with a definite and firm conviction that the trial court erred by finding that termination was in the children's best interest.

Affirmed.

/s/ Michael J. Kelly
/s/ Christopher M. Murray
/s/ Michael J. Riordan